**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| CAPREALTY 14-VILLAGE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>WEST BEND MUTUAL INSURANCE COMPANY,<br><br>Defendant. | Case No. 3:25-cv-20<br><br>**COMPLAINT AND JURY DEMAND** |

COMES NOW, Plaintiff, CapRealty 14-Village, LLC ("Plaintiff"), by and through undersigned counsel, and for its Complaint against Defendant, West Bend Mutual Insurance Company ("Defendant"), states and alleges as follows:

## INTRODUCTION

1. Plaintiff's commercial property, located at 902 West Kimberly Road, Davenport, Iowa 52806 (the "Property"), sustained severe and increasing loss from a covered weather-related event, namely a wind and hail-bearing storm that occurred on or about April 4, 2023 (the "Storm").

2. In the aftermath, Plaintiff relied on Defendant, its insurance carrier, to help it recover and rebuild, as per the terms of Insurance Policy No. 1000290317, eff. April 8, 2022, to April 8, 2023 ("the "Policy"). However, contrary to Defendant's representations to Plaintiff, Defendant improperly adjusted Plaintiff's claim, bearing Claim No. AQ32829 (the "Claim"), thereby depriving Plaintiff of the coverage it purchased from Defendant. As a result, Plaintiff is now required to take legal action to ensure it receives the coverage owed to it by Defendant.

**PARTIES**

3. Plaintiff, CapRealty 14-Village, LLC, is a Delaware limited liability corporation with its headquarters and principal place of business located at 730 Cool Springs Blvd., Ste. 630, Franklin, TN 37067. CapRealty 14-Village, LLC, is owned by Davenport MM, LLC.

a. Davenport MM, LLC is a Delaware limited liability company with its headquarters and principal place of business located at 730 Cool Springs Blvd., Ste. 630, Franklin, TN 37067. Davenport MM, LLC is owned by Village MM, LLC.

b. Village MM, LLC is a Delaware limited liability company with its headquarters and principal place of business located at 730 Cool Springs Blvd., Ste. 630, Franklin, TN 37067. Village MM, LLC is owned by Capstone Realty, LLC.

c. Capstone Realty, LLC is a Delaware limited liability company with its headquarters and principal place of business located at 730 Cool Springs Blvd., Ste. 630, Franklin, TN 37067.

d. Capstone Realty, LLC is owned David H. Lee and Amy L. Lee, individuals domiciled at 1701 Talbot Trail, Franklin, TN 37069.

4. At all material times, Plaintiff owned the Property located at 902 W. Kimberly Rd., Davenport, Iowa 52806 and was a named insured on the Policy.

5. Defendant, West Bend Mutual Insurance Company, is a Wisconsin insurance corporation, with its headquarters and principal place of business located at 1900 S. 18th Avenue, West Bend, Wisconsin 53095. West Bend Mutual Insurance Company is and has been engaged in the business of selling insurance policies, including Plaintiff's insurance policy, in the State of Iowa. Defendant may be served with process by serving its registered agent for service, C.T. Corporation System, 400 E. Court Avenue, Des Moines, Iowa 50309.

**JURISDICTION AND VENUE**

6. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because of the diversity of citizenship of the parties and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

7. An actual justiciable controversy exists between Plaintiff and Defendant within the meaning of 28 U.S.C. § 2201 regarding whether Defendant breached its duties to Plaintiff in violation of the express terms, conditions and provisions of the Policy, as more particularly described below.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## FACTUAL BACKGROUND

9. Plaintiff CapRealty 14-Village, LLC, owns the subject commercial property, which is located at 902 W. Kimberly Rd., Davenport, Iowa 52806.

10. The Property is a commercial shopping center plaza with multiple attaching low-slope roofs (Roofs 1-12) and one detached building (Roof 13). Aluminum/steel gutters and downspouts are attached to multiple eaves of the plaza roofs. The types of roofing surfaces for each of the 13 roofs are set forth below:

a. Roof 1 is a ballasted modified bitumen (“Mod-Bit”) roof;

b. Roof 2 is a ballasted Carlisle EPDM roof (45 mils thick);

c. Roof 3 is a ballasted Carlisle EPDM roof (45 mils thick);

d. Roof 4 is a mechanically fastened EPDM roof (60 mils thick);

e. Roof 5 is a mechanically fastened EPDM roof (60 mils thick);

f. Roof 6 is a mechanically fastened EPDM roof (60 mils thick);

g. Roof 7 is a mechanically fastened PVC roof (60 mils thick);

h. Roof 8 is a ballasted Firestone EPDM roof (45 mils thick);

i. Roof 9 is a mechanically fastened PVC roof (60 mils thick);

j. Roof 10 is a mechanically fastened EPDM roof (60 mils thick);

k. Roof 11 is a ballasted modified bitumen (“Mod-Bit”) roof;

l. Roof 12 is a mechanically fastened Carlisle EPDM roof (45 mils thick); and

m. Roof 13 is a ballasted Firestone EPDM roof (60 mils thick).

11. As consideration for Plaintiff's payment of an annual premium, Defendant issued the Policy to Plaintiff CapRealty 14-Village, LLC, as a named insured.

12. Under the Policy, Defendant agreed to, *inter alia*, insure the Property against direct physical loss caused by wind and hail, subject to all terms, conditions, and exclusions of the Policy:

**A. COVERAGE**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. COVERED PROPERTY**

Covered Property, as used in this Coverage Part, means the type of property described in this section, A.1., and Limited in A.2. Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including [in relevant part]:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery; and

(b) Equipment.

*Ex. A, Building and Personal Property Coverage Form (CP 00 10 10 12) at 1.*

***

**A. COVERED CAUSES OF LOSS**

When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:

a. Excluded in Section B. Exclusions; or

b. Limited in Section C. Limitations in this section.

*Ex. A, Commercial Property Causes of Loss – Special Form (CP 10 30 09 17) at 1 and 6.*

13. Defendant further agreed to pay any increased cost to complete any additional repairs or reconstruction necessary as a consequence of enforcement of building, zoning, or land use ordinance or law:

> **4. ADDITIONAL COVERAGES**
>
> a. **Debris Removal**
>
> ***
>
> (1) Subject to Paragraphs (2), (3), and (4), we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.
>
> ***
>
> (3) Subject to the exceptions in Paragraph (4), the following provisions apply:
>
> a) The most we will pay for the total of direct physical loss or damage plus debris removal expense is the limit of Insurance applicable to the Covered Property that has sustained loss or damage;
>
> b) Subject to (a) above, the amount we will pay for debris removal expense as limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.
>
> ***

*Ex. A, Building and Personal Property Coverage Form (CP 00 10 10 12) at 3.*

14. On or about April 4, 2023, while the Policy was in full force and effect, the Property sustained direct, physical loss resulting from a significant wind and hail-bearing storm, which constitutes a covered loss under the Policy.

15. The Storm damaged all of the Property's roof coverings, metal appurtenances, HVAC units, and gutters.

16. Plaintiff timely notified Defendant of the loss on April 17, 2023, at which time Defendant acknowledged the Claim, assigned it Claim No. AQ32829, and assigned James A. Carratt, Jr. as the adjuster on Plaintiff's claim.

17. On May 16, 2023, Defendant performed an inspection of the Property through its retained engineer, E. Brian Rosero, P.E. with Nederveld, Inc. ("Nederveld"). The assistant property manager with Ruhl Commercial Company, Jeff Smith, Chris Reid with Olde Town Roofing, and Jim Carratt with West Bend Mutual Insurance Company ("West Bend"), a building consultant with West Bend, and Wesley Hixon with Nederveld were also present during the inspection.

18. Defendant's retained engineer, E. Brian Rosero, P.E. of Nederveld provided a report of its findings on July 13, 2023 (the "Nederveld Report"). Nederveld identified commercially available weather data reporting that 2 ¾ inches hail occurred at the Property on or around the Storm date. Additionally, Nederveld found the following related to each roof as a result of the Storm:

a. Roof 1 sustained hail impact damage with fractures to the reinforcement mat on the south, east, and west parapet walls;

b. Roof 2 sustained hail impact damage at the south end of the roof;

c. Roof 3 sustained hail impact damage at the east and south parapet walls, including hail impact damage to the substrate below the membrane at the south parapet wall;

d. Roof 4 sustained hail impact damage to the substrate below the membrane, with a surface fractures of the rigid insulation board at the south end of the roof (a newer

roof membrane), as well as a surface fracture of the rigid insulation board at the older portion of the roof, with elevated moisture levels;

e. Roof 5 sustained hail impact damage to the substrate below the membrane;

f. Roof 6 consists of two membranes of different ages. The older portion of Roof 6 sustained hail impact damage to the substrate below the membrane, and the newer portion of Roof 6 sustained hail impact damage to the substrate below the membrane, with a surface fractures of the rigid insulation board, with elevated moisture levels;

g. Roof 7 sustained hail impact damage to the substrate below the membrane;

h. Roof 8 reflected hail-generated spatter marks;

i. Roof 9 sustained hail impact damage to the substrate below the membrane;

j. Roof 10 consists of multiple membranes at different elevations. The membranes were found to have widespread hail-generated spatter marks, along with hail impact damage to the underlying substrate;

k. Roof 11 reflected hail-generated spatter marks to the membrane, and this roof sustained hail impact damage with a fracture to the reinforcement mat;

l. Roof 12 reflected widespread hail-generated spatter marks, along with coinciding hail impact damage to the substrate below the membrane; and

m. Roof 13 reflected widespread hail-generated spatter marks, along with coinciding hail impact damage to the substrate below the membrane at the north end of the roof.

19. However, Nederveld concluded that the identified hail impact damage to each of Plaintiff's roofs can be repaired rather than replaced, despite the significant identified damage.

20. Nederveld also found hail impact damage to the unoxidized steel coping throughout the roofs; hail impact fractures to the vinyl siding along the east parapet wall of Roof 1; hail impact damage to the unoxidized metal exhaust vents; hail impact damage to the condenser coil fins of multiple HVAC roof top units; hail impact damage to the steel cladding along the top of all rooftop units; hail impact damage to the roof vents of Roof 4; and hail impact damage to the aluminum and steel gutters. However, Nederveld concluded that the metal roof appurtenances do not have functional damage.

21. Additionally, on or about July 13, 2023, Kevin Boysen, an HVAC consultant with Nederveld provided a report of its findings related to the HVAC units on Plaintiff's Property (the "Nederveld HVAC Report"). Nederveld inspected 81 HVAC units and found hail impact damage to the units; however, Nederveld indicated that there was no noteworthy functional or aesthetic impact damage to the rooftop units' cover panels. Despite these findings, the Nederveld HVAC Report included an estimate of repairs to damaged units totaling $329,191.80, indicating that the units can be repaired and do not require replacement.

22. On or about August 25, 2023, Nederveld provided a supplemental HVAC report (the "Nederveld Supplemental HVAC Report"), following a request from Defendant to provide an estimate for any HVAC damage, irrespective of whether that damage is functional. Within the Nederveld Supplemental HVAC Report is an updated estimate of repairs to the impacted HVAC units totaling $541,958.71.

23. On or about August 28, 2023, Defendant provided an estimate from Anderson Insurance Services, of damages (the "Anderson Estimate"), recommending repairs totaling $808,569.70, primarily related to the Property's damaged HVAC units, minor roof repairs to Roofs 1, 2, 3, 4, 5, 6, 7, and 13, gutters, and metal appurtenances.

24. On or about September 11, 2023, Defendant advised Plaintiff that is would be issuing payments as follows:

a. Building 1: $215,343.76 (RCV), less $61,057.22 recoverable depreciation, less the applicable deductible of $61,717.97, for an ACV total of $92,568.57;

b. Building 2: $107,930.69 (RCV), less $34,102.90 recoverable depreciation, less the applicable deductible of $37,403.22, for an ACV total of $36,424.57;

c. Building 3: $442,387.58 (RCV), less $104,245.40 recoverable depreciation, less the applicable deductible of $193,607.52, for an ACV total of $144,534.66;

d. Building 4: $42,907.67 (RCV), less $10,842.60 recoverable depreciation, less the applicable deductible of $10,623.30, for an ACV total of $21,441.77.

25. On or about September 11, 2023, Defendant issued payment to Plaintiff as outlined above for a total ACV payment of $294,972.57.

26. In October 2023, Plaintiff's consulting engineer, DOTec Corp. Customized Engineering Solutions ("Dotec") inspected Plaintiff's Property. Following Dotec's Property inspections, it issued reports on November 21, 2023 (the "Dotec Reports").

27. The Dotec Reports identified commercially available weather data reporting that 2 ½ inches hail occurred at the Property on or around the Storm date. Additionally, Dotec found that each of Plaintiff's commercial roofing systems, HVAC units, and interiors sustained direct physical damage as a result of the Storm; the identified hail impact damage was not a result of any hail event that may have occurred prior to April 4, 2023; and concluding that each of the hail impact damaged roofing systems require full replacement.

28. On or about January 4, 2024, Plaintiff retained Ethos Adjusting ("Ethos") to assist it with the claims handling process.

29. On or about March 28, 2024, Plaintiff obtained a quote from a local contractor, Olde Town Roofing (the "Olde Town Estimate") for replacing Plaintiff's roofing systems, metal appurtenances, gutters, and HVAC units totaling $5,953,645.53, less applicable deductibles.

30. On or about May 8, 2024, Nederveld reinspected Plaintiff's Property at the request of Plaintiff. Chris Reid with Olde Town Roofing; Jeff Smith, the property manager with Ruhl Commercial Company; Wes Anderson with Anderson Insurance Services; and Jordan Poehling with Ethos were also present for this inspection. During this inspection, eight test cuts were performed on Roofs 2, 3, 4, 5, 7, 8, and 10.

31. On or about May 29, 2024, Ethos Adjusting provided an estimate of damages (the "Ethos Estimate"), recommending repairs to Plaintiff's roofing systems, metal appurtenances, gutters, and HVAC units totaling $4,666,452.42, less applicable deductibles.

32. Based on the property reinspection of May 8, 2024, on or about June 7, 2024, Nederveld provided a second supplemental report (the "Nederveld Second Supplemental Report"). Nederveld found additional damage to roofs 22, 3, and 8; however, it maintained that its prior opinions regarding roofs 4, 5, 7, and 10 remained unchanged.

33. On or about July 1, 2024, Defendant issued a partial denial letter to Plaintiff, stating that its position remained unchanged from its September 11, 2023, payment letter.

34. After receiving Defendant's July 1, 2024, partial denial letter, Plaintiff retained StructuraView to perform an in-depth moisture map of the Property's roof. StructuraView inspected the property on October 10, 2024, and prepared a report on October 25, 2024.

35. As part of its analysis, StructuraView performed a drone-based visible and thermal scan of 36 roof sections of the 13 roofing systems, totaling 249,986 square feet.

36. The thorough moisture mapping performed by StructuraView revealed significant suspected moisture intrusion throughout many of the roofing systems. Specifically, from the data collected, StructuraView identified 44 moisture locations throughout multiple sections of the roofing systems, totaling an estimated 13,916 square feet square feet of moisture.

37. On or about November 15, 2024, Plaintiff provided a copy of the StructuraView moisture mapping report to Defendant in conjunction with a demand for payment of the Ethos Adjusting estimate of damages.

38. Plaintiff made a timely and complete claim, and cooperated in every aspect of the same, yet this claim has been unfairly adjusted and delayed for an excessive period of time. This delay has now compounded the loss at the Property, all of which stands in stark contrast to the representations made to Plaintiff by Defendant when it purchased the policy.

39. Defendant grossly underpaid Plaintiff's Property claim by underestimating the value of the damages during its investigation. Defendant's adjusters prepared an estimate of

damages that is deficient based on an improper and inadequate results-oriented investigation that ignored obvious hail damage.

40. Defendant also failed to make timely payment of damages based on the improper and inadequate investigations and analysis performed by its representatives. The Policy unambiguously insures the covered loss and resulting damages.

41. As a result of Defendant's failure to adequately investigate Plaintiff's covered loss and failure to pay for all of the damages as required by its Policy, Plaintiff has been unable to properly repair the Property.

42. As a result of Defendant's failure to properly adjust the claim and its refusal to pay the true value of the covered loss to the Property, Plaintiff was left with no choice but to hire its own professionals, incurring significant costs and expenses associated with proper evaluation and investigation of Plaintiff's covered loss.

43. As a result of Defendant's failure to honor its obligations and duties under the Policy, Plaintiff was also forced to retain the services of legal counsel to protect its rights and remedies under the Policy and as an insured.

44. As of this date, Plaintiff has met, complied with, and continues to meet and comply with, all conditions precedent and duties under the subject insurance Policy. Otherwise, all such conditions and duties have been waived by Defendant.

**BREACH OF CONTRACT**

45. Plaintiff incorporates by reference all allegations set forth in paragraphs 1 through 41 above as though fully stated herein.

46. Plaintiff entered into a valid and enforceable written insurance contract with Defendant pursuant to the laws of Iowa. Defendant sold, in exchange for valuable consideration,

the Policy, whereby Defendant agreed, *inter alia*, to insure, the Property against direct physical loss caused by wind or hail.

47. The Policy outlined contractual obligations to be performed by both Plaintiff and Defendant, including but not limited to, Plaintiff paying policy premiums for its insurance coverage, and Defendant providing said coverage for claims in the event of covered damage.

48. Plaintiff fully performed its contractual obligations and all conditions precedent for coverage, including making timely policy premium payments and timely reporting of covered losses upon discovery, as required by the insurance contract with Defendant.

49. Defendant then materially breached the contract by failing to pay for the full value of the damages to the Property as required under the Policy.

50. Defendant had no reasonable basis for denying the benefits of the insurance Policy and refused to pay the full amount of the loss without just cause or excuse.

51. Due to Defendant's breach of the Policy, Plaintiff has suffered damages by way of unpaid insurance proceeds and benefits, has been forced to retain counsel, and further has been damaged by a sum to be determined at trial and final judgment.

52. Plaintiff's damages include, without limitation, actual damages, and interest because of Defendant's breach of contract.

## JURY DEMAND

53. Plaintiff hereby demands a jury for all triable issues and has tendered payment for a jury trial contemporaneously with the filing of this Original Complaint.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that it be awarded actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post- judgment

interest as allowed by law, costs of suit, all such additional relief specified within this Original Complaint, and all such other relief, at law or in equity, to which Plaintiff may be justly entitled.

DATED this 4th day of March, 2025.

CAPREALTY 14-VILLAGE, LLC, Plaintiff

By: /s/ Keith A. Harvat

Keith A. Harvat - AT0010844
HOUGHTON BRADFORD WHITTED PC LLO
6457 Frances Street, Suite 100
Omaha, Nebraska 68106
(402) 344-4000 | (402) 930-1099 (Fax)
kharvat@houghtonbradford.com
*Attorneys for Plaintiff*

4914-8808-6308, v. 5